UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**SOUTHERN DIVISION at LONDON**

PAMELA K. CARPENTER,           )
                               )
    Plaintiff,                 ) Civil Action No. 6:08-cv-371-JMH
                               )
v.                             )
                               )
MICHAEL J. ASTRUE,             )
COMMISSIONER OF SOCIAL         )    **MEMORANDUM OPINION AND ORDER**
SECURITY                       )
                               )
    Defendant.                 )
                               )


                **         **         **         **         **

    This matter is before the Court upon cross-motions for summary
judgment on the plaintiff's appeal of the Commissioner's denial of
her application for Supplemental Security Income and Disability
Insurance Benefits.   [Record Nos. 8, 9, and 10.][1]   The Court,
having reviewed the record and being otherwise sufficiently
advised, will deny the plaintiff's motion and grant the defendant's
motion.

I.   **FACTUAL AND PROCEDURAL BACKGROUND**

    Plaintiff filed for disability benefits in October 2005,
alleging an onset of disability of July 1, 2001 [AR at 22, 65,
490] due to lower back pain and her psychological condition.   [AR
at 91, 496-501, 502-508.]   Her claim was denied initially and on

---

    [1] These are not traditional Rule 56 motions for summary
judgment.   Rather, it is a procedural device by which the parties
bring the administrative record before the Court.

reconsideration, and she requested a hearing, which was held on May 10, 2007. [AR at 43, 48-50, 55, 487-521.] Her application was subsequently denied by Administrative Law Judge ("ALJ") Frank Letchworth in a decision dated August 6, 2007. [AR at 19-32.] The Appeals Council denied Plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner [AR at 9-12, 18.] This matter is ripe for review and properly before this Court under § 205(c) of the Social Security Act, 42 U.S.C. § 405(g).

Plaintiff was thirty-five-years old at the time of the ALJ's decision. She has a high school education, two semesters of college education, and past relevant work experience as a sales representative, janitor, waitress, and cashier. [AR at 491-92, 495-96.] It is undisputed that Plaintiff has not worked since the date of the alleged onset of her disability.

The Administrative Record in this matter is replete with detailed documentation of Plaintiff's treatment for the conditions that she alleges to be disabling. For example, Plaintiff was treated from 2005 to 2007 by Dr. Syed Umar for major depressive disorder.[2] When he saw her first, on April 7, 2005, she was alert

---

[2] Plaintiff was also treated for Major Depressive Disorder and anxiety by Dr. Kennedy in October 1999, April 2000, and October 2000 [AR at 327-328, 332, 337-39] and Dr. Robina Bokhari from August 2000 through October 2000 [AR at 310-313]. During treatment, Dr. Bokhari assigned Plaintiff a GAF of 50. [AR at 310-313.]

She was also seen by Dr. Herbert Steger from November 2000

and cooperative, with a healthy appearance and fair grooming. [AR at 120.] Her mood was depressed, her affect was "labile," and her speech was slow. [*Id.*] Her memory was intact, her attention and concentration satisfactory, and her insight and judgment intact. Dr. Umar assessed her on the Global Assessment of Functioning Scale (hereinafter, "GAF") in a range of 40-50.[3] [*Id.*] On June 8, 2005, Plaintiff's mood was "OK," her affect clam, and she had low amplitude in her speech. [*Id.*] She was assigned a GAF of 50. [AR at 119.]

On August 17, 2005, Plaintiff appeared cooperative to Dr. Umar, but her affect was angry. [AR at 118.] She indicated that she wished to die. [*Id.*] Her GAF range was assessed as 40-50.

---

through September 2001 [AR at 296-309]. In a report prepared in 2001 for the Department of Workers Claims in connection with treatment for a work-related injury, Dr. Steger opined that Plaintiff had a GAF of 60 has severe limitations with the ability to "deal with stresses" and "maintain attention/concentration," with "no useful ability to function in this area." [AR at 297, 300.] She had, however, a good ability to follow work rules, relate to co-workers, deal with the public, and use judgment, and a fair ability to interact with supervisors. [AR at 300.]

Additionally, Dr. Rodney Oakes, Plaintiff's family physician, diagnosed Plaintiff with depression on December 10, 1998, and again noted a diagnosis of chronic depression in January 2004. [AR at 356, 367.] In February 2005, Oakes noted an impression of panic attacks with a "worsening depression despite being on an adequate dose of Zoloft." [AR at 354.]

[3]A score of 41-50 on the GAF Scale indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." [See Exh. to Defendant's Motion for Summary Judgment at Record No. 10-2.]

[*Id.*]  On September 15, 2005, Plaintiff appeared sick, due to use of a back brace, but was cooperative.  [AR at 117.]  Her mood was variable, her affect "panged", and her speech clear.  [*Id.*]  Dr. Umar assigned a GAF of 50.  [*Id.*]

Plaintiff was admitted to the Lake Cumberland General Hospital on November 11, 2005, by Dr. Umar because she was having suicidal thoughts.  [AR at 419-21.]  At that time, Dr. Umar found Plaintiff cooperative and observed that she related well with him, opening up with her emotional symptoms.  [*Id.*]  Her mood was depressed, her affect was tearful, but her speech was clear.  [*Id.*]  Her thought process was overall coherent, and she presented with suicidal ideation without any plan.  [*Id.*]  Her concentration, attention, and immediate memory were mildly impaired, but her insight and judgment were fair.  [*Id.*]  Dr. Umar assigned her a GAF of 35.  [*Id.*]  At discharge, on November 17, 2005, Dr. Umar found Plaintiff to be cooperative and compliant with pleasant affect, clear speech, coherent and goal-directed thought process, and no suicidal or homicidal ideation, hallucinations, or delusions.  [AR at 417.]  Plaintiff reported her mood to be good.  [*Id.*]   Dr. Umar assessed a GAF score of 45.  [*Id.*]

On November 30, 2005, Plaintiff again sought treatment with Dr. Umar, who found her to be healthy and cooperative, with better mood, pleasant affect, and clear speech.  [AR at 274.]  Dr. Umar assigned a GAF of 50.  [*Id.*]  On March 2, 2006, Plaintiff's

4

objective appearance was healthy and cooperative.  [AR at 273.]
Her mood was overall good, her affect tired, and her speech clear.
[*Id.*]  Dr. Umar assigned a GAF of 50.  [*Id.*]  On April 3, 2006,
Plaintiff appeared healthy and cooperative, with a better mood,
calm affect, and clear speech.  [AR at 272.]  Dr. Umar again
assigned her a GAF of 50.  [*Id.*]  On May 11, 2006, Plaintiff
appeared healthy and cooperative, had an "overall OK" mood, calm
affect, and clear speech.  [AR at 271.]  Dr. Umar assigned a GAF of
50.  [*Id.*]  On June 12, 2006, Plaintiff appeared healthy and
cooperative, although Dr. Umar found Plaintiff had a nervous mood,
as well as appropriate affect and clear speech.  [AR at 270.]  her
GAF was assessed at 50.  [*Id.*]

On July 11, 2006, Plaintiff appeared healthy and cooperative
to Dr. Umar.  [AR at 269.]  He found her mood was better but
depressed, her affect neutral, and her speech clear.  [*Id.*]  Dr.
UMAR again assessed her GAF as 50.  [*Id.*]  On August 30, 2006,
Plaintiff appeared healthy and cooperative, but her mood was tired,
her affect congruent, and her speech slow.   [AR at 268.] No GAF
was assigned.  [*Id.*]  On October 16, 2006, Plaintiff appeared
healthy and cooperative to Dr. Umar , but had a depressed mood,
incongruent affect, and exhibited a normal rate of speech.  [AR at
441.]  Her attention and concentration were satisfactory.  [*Id.*]
Dr. Umar assessed a GAF of 50.  [*Id.*]  On November 15, 2006,
Plaintiff appeared healthy and cooperative to Dr. Umar, in a fair

mood, with a pleasant affect, and clear speech.  [AR at 440.] Her attention and cognition were fair, and he assigned her a GAF of 55.[4]  [*Id.*]

On January 23, 2007, Dr. Umar found that Plaintiff appeared healthy and cooperative, but her mood was despondent and nervous, her affect sad, and her speech slow, although her attention and concentration was satisfactory.  [AR at 439.]  He assigned her a GAF range of 45-50.  [*Id.*]  On February 12, 2007, Dr. Umar found that Plaintiff appeared healthy and cooperative, had a neutral affect and clear speech, no delusions, and satisfactory attention or concentration, and he assigned her a GAF in a range from 45 to 50.  [AR at 438.]  On March 12, 2007, he found Plaintiff healthy and cooperative, with a good mood, appropriate affect, clear speech, fair attention and concentration, and no delusions, assigning her a GAF of 50.  [AR at 437.]

Dr. Magdy El-Kalliny, a neurosurgeon, treated Plaintiff from for problems with her lower back over the course of a number of years.  He diagnosed Plaintiff with a disc bulge at L4-5 upon review of a lumbar MRI, initially recommending conservative treatment.  [AR at 343-348.]  From September 1998 through December 2004, Plaintiff received eight injections in her spine to treat her

---

[4]A score of 51-60 on the GAF Scale indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) [or] moderate difficulty in social, occupational, or social functionining (e.g., few friends, conflicts with peers or co-workers)."  [See Record No. 10-2.]

lower back condition.   [AR at  398-412.]  Finally, on August 22, 2005, Dr. El-Kalliny performed an artificial disc replacement surgery at L4-5.  [AR at 114-15.]

On January 27, 2006, a Functional Capacity Evaluation Summary Report was completed at the Total Rehab Center upon Dr. El-Kalliny's request.  [AR at 129.]  At that time, her hip flexion measured 30 degrees, her hip extension fifteen degrees, her lumbar flexion 45 degrees, her thoracic flexion 10 degrees, her lumbar extension 10 degrees, her lumbar extension 10 degrees, and her thoracic extension 5 degrees.  [AR at 129.]  Her gait pattern was normal and her movement patterns were smooth with good quality of movement.  [AR at 130.]  She transferred and altered positions with ease.   [AR at 130.]   Nonetheless, the examiner noted "diffuse tenderness to palpation through out [sic] the lumbar region both in the midline and the paravertebral musculature" with no spasm.  [AR at 130.]  Plaintiff reported marked limitations with squatting, stooping, jumping, and running and rated her pain as a 7 on a scale of 0-10.  [Id.]  The therapist concluded that she was able to "[p]erform many upper extremity tasks without significant limitations" and that "[h]er coordination and manual dexterity in both upper extremities [was] unaffected."  [AR at 131.]  It was also concluded that:

> (1)  She is unable to do activities of a highly repetitious nature due to the extent of her pathology affecting the lumbar spine.

7

>    (2) She is unable to lift more than 25 lbs
>    from a floor to waist lift because of weakness
>    in both lower extremities and spinal
>    musculature.
>
>    (3) Activities that require her to maintain a
>    static position either in sitting, standing,
>    or in a forward bent position will not be
>    tolerated.

[AR at 131.]

After Dr. El-Kalliny indicated that he had done all that he could do for Plaintiff's lower back condition, he referred her to Dr. Howard Lynd, a pain management physician. Dr. Lynd began treating Plaintiff on February 14, 2006, noting impressions of chronic low back pain, MRI proven lumbar intervertebral disc disease at L4-5 and L5-S1, and a lumbar radicular pain pattern. [AR at 258-261, 436.] Dr. Lynd provided nine lumbar injections to treat her lower back pain during the course of his treatment of Plaintiff. [AR at 186-91; 262-63; 371-73, 375-77; 470-75.] During a follow up visit on September 26, 2006, Dr. Lynd noted that she "had an excellent response to injections, reporting 65% improvement with a pain decrease to 6/10 in intensity. [AR at 436.] On April 12, 2007, he noted that Plaintiff reported the return of her pain after 6 months of "good relief" from her last set of injections "which is an excellent response to facet interarticular steroid injections." [AR at 455.] Upon a physical exam, he found her condition unchanged from her last visit and noted that "she continues to have hyperalgesia over the paraspinous musculature of

8

the lumbar facets at L4-L5 and L5-S1.  [*Id.*]  She has more pain on extension than flexion.  SLR remains negative.  Facet rocking is positive."  [*Id.*]

Dr. Lynd, on April 12, 2007, opined that Plaintiff could sit, stand, or walk for only 15 minutes at a time, but also opined that she could not sit, stand, or walk for any period of time within an 8 hour work day.  [AR at 454.]  He opined that she must have additional work breaks, alternate sit/stand option to relieve pain and fatigue, and must lie down periodically to relieve pain and/or fatigue.  [*Id.*]  He opined that she could occasionally lift or carry up to ten pounds but never more than ten pounds.  [*Id.*]  He found she was capable of simple grasping and fine manipulation but not pushing/pulling arm controls and that she could not use her feet for repetitive movement such as pushing, pulling, or operation of foot controls.  [*Id.*]  He opined that she was never able to bend or stoop, squat or crouch, kneel or crawl, climb, reach, or work near vibrations.  [*Id.*]

On December 30, 2005, a consulting examining agency physician Dr. Greg V. Lynch, examined Plaintiff and issued an opinion as to her mental health condition "based upon a review of the Plaintiff's history, a current mental status interview, and the consultant's clinical opinion."  [AR at 123-27.]  Dr. Lynch did not review any treatment records from any of Plaintiff's treating medical providers and did not review Dr. Umar's treatment records nor those

related to Plaintiff's six day hospitalization at Lake Cumberland Regional Hospital in November 2005. Dr. Lynch assigned her a GAF of 58 and concluded that:

> [Her] capacity to understand, remember and carry out instructions towards the performance of simple, repetitive task is not affected. [Her] ability to tolerate stress and pressure of day-to-day employment is affected by the impairment with slight limitations noted. The person's ability to sustain attention and concentration towards performance of simple repetitive task is affected by the impairment with slight limitations noted. The person's capacity to respond appropriately to supervision, coworkers, and work pressures in a work setting is affected by the impairment with slight limitations noted.

[AR at 126.]

On March 22, 2007, consulting examining agency physician, Dr. Fritzhand, observed during his examination that Plaintiff had 50 degrees of flexion, 60 degrees of extension, 80 degrees of rotation bilaterally, and 45 degrees of lateral flexion bilaterally in her cervical spine, which was within normal limits. [AR at 444.] He found that she could squat and walk heel-to-toe, walk on heels and on her toes. She had a normal spine curvature. [*Id.*] She had difficulty bending forward at the waist to 60 degrees but could stand on either leg. [*Id.*] The extension of the spine was diminished to 10 degrees. [*Id.*] Lateral flexion of the spine was normal to 30 degrees on te left and diminished to 10 degrees on the right. [*Id.*] On examination of the spine, straight leg raising was  diminished to 70 degrees on the left and 40 degrees on the

10

right.  [*Id.*]

He noted an impression of traumatic and degenerative joint disease in her lumbar spine with chronic lower back pain and her history of MRI proven lumbar intervertebral disc disease at L4-5 and L5-S1 S/P disc replacement L5-S1.  [AR at 445.]  Dr. Fritzhand also completed a functional capacities form where he opined that Plaintiff could lift and carry 10-20 pounds occasionally but could never lift anything greater than 20 pounds.  [AR at 448.]  He opined that she could reach above shoulder level frequently.  She could sit continuously for one hour and for four hours with rest and could stand or walk for 30 minutes continuously and for 2-3 hours with rest.  [*Id.*]  He further opined that she could use her hands for repetitive actions such a simple grasping, pushing/pulling, and fine manipulating.  [*Id.*]  Finally, he opined that she had no restrictions with regard to activities involving heights, moving machinery, exposure to marked changes in temperature and humidity, driving automobile equipment, or exposure to dust, fumes, and gases.  [*Id.*]

During her hearing, Plaintiff testified that she was unable to sit for more than fifteen minutes before having to move, unable to stand more than fifteen minutes without having to sit down, and unable to walk more than a block.  [Ar at 501, 509-10.]  Plaintiff has also testified that she stays in bed all day, cries a lot, and has no outside activities.  [AR at 511-12.]

The ALJ also determined that the Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms" but that her statements concerning the "intensity, persistence and limiting effects of these symptoms are not entirely credible." [AR at 29.] Specifically, he noted that she claimed to have been treated for 5 years by Dr. Umar but had, in fact only been treated by him since 2005 and that she had, contrary to her testimony, reported caring for her children, feeding them, and clothing them. [AR at 85.] In November 2005, Plaintiff stated that she prepared food for herself and others, washed dishes every three days, and went shopping once or twice a week. [AR at 98.] Contrary to her testimony that she had no hobbies [AR at 504], Plaintiff reported in March 2007 that she watched television and read during the day. [AR at 111.] The ALJ was also concerned that Plaintiff had not been entirely compliant with treatment, reporting use of marijuana on one occasion. [AR at 29.]

Based upon the medical evidence of record, the ALJ posed various hypothetical questions to the vocational expert ("VE"). First, the ALJ asked the VE if Plaintiff would be able to perform her past relevant work, assuming that she had the following nonexertional restrictions:

> . . . capable of performing a range of light exertion, no climbing of ladders, ropes or scaffolds, no crawling, no more than occasional climbing of ramps or stairs or stooping or bending or crouching. No work at unprotected

> heights, hazardous equipment, no more than occasional
> overhead reaching. . . . [N]o more than simple job
> instructions, no more than occasional casual interaction
> with other persons, that would include coworkers,
> supervisors, general public.

[AR at 516-17.] The VE testified that she would not be able to perform her past work with those restrictions. [AR at 517.] Having further considered her age, education, and work experience, the VE testified that there were other jobs in the regional or national economy that someone with such restrictions and characteristics could perform, as follows:

> Inspectors, testers, 2,100 in the region,
> 120,000 in the nation . . . reduced 10 percent
> to accommodate the limitation for the
> hypothetical, it is a representative and non-
> exhaustive list [if] the region is the state
> of Kentucky, sir.

[AR at 517.] The VE further testified that the additional requirement of a 30-minute sit/stand option would not change his conclusion. [*Id.*]

The ALJ also inquired of the VE what impact would be had if a claimant had as additional restrictions, which echoed Plaintiff's restrictions as assessed by Dr. Umar:

> . . . a seriously limited but not precluded
> ability to remember work like procedure, to
> maintain attendance and be punctual within
> customary tolerances, to sustain an ordinary
> routine without special supervision, to work
> in coordination with or proximity to others
> without being distracted by them, to
> independently make simple work related
> decisions, to complete a normal workday and

13

> work week without interruptions from
> psychologically based symptoms and perform at
> a consistent pace. Accept instructions and
> respond appropriately to criticism from
> supervisors, to get along with coworkers or
> peers without distracting them or exhibiting
> behavioral extremes, to respond appropriately
> to changes in a routine work setting.

[AR at 518.] The VE indicated that it would eliminate a claimant's ability to work in any job. [*Id.*]

Finally, the ALJ inquired whether there was any of the VE's testimony that would be inconsistent with the Dictionary of Occupational Titles ("DOT"), to which the ALJ responded, in relevant part, that the DOT did not provide for a sit/stand option in inspector/tester positions. [AR at 518.] The VE testified that his "answers came from [his] experience in employment service, [his] experience as a [VE], [his] observation of jobs." [AR at 518.]

Upon cross-examination by Plaintiff's counsel, the ALJ identified the DOT reference number for inspector/tester as "733687062" with an actual job title of "pencil inspector." [AR at 519.] When asked for the names of companies at which employees performed the work of a pencil inspector in the region, the VE responded, "I don't know of any to my knowledge." [AR at 520.]

In determining that Plaintiff retained a functional capacity to perform light work with certain limitations, the ALJ considered the impact of Plaintiff's back pain and disc disease and her

14

chronic depression on her ability to work.  Specifically, he considered and weighed the opinions of her treating physicians and those consultative agency physicians familiar with her conditions. In his decision, the ALJ discredited the opinions of Plaintiff's treating physician, Dr. Umar, with regard to the effect of Plaintiff's depression on her ability to work, explaining that:

> The undersigned has also considered Dr. Syed A. Umar's, M.D., treating reports which repeatedly indicate Global Assessment of Functioning (GAF) scores in the 50's and as low as 45.  Essentially, Dr. Omar assigned a GAF of 50 nearly every time he saw the claimant whether she described and [sic] increase or decrease in symptoms. Furthermore, his GAF score of 45 (which connotes serious mental limitations) was assigned at hospital discharge in November 2005, when mental status examination findings were fully benign.  Thus, the undersigned believes Dr. Umar had been unduly restrictive (and/or inattentive) in assigning GAF scores.
>
> Again in a completed Mental Functional Capacity Statement dated May 31, 2007, Dr. Umar assessed marked and extreme mental limitations, but there are no specific indications as to whether these limitations were present as of June 2001.  Dr. Umar did not see the claimant prior to April 2005.  Nor does Dr. Umar provide medical findings on which the Functional Capacity Statement was based.  Accordingly, his opinion is inadequately supported.

[AR at 26.]  The ALJ was concerned with the lack of evidence, whether medical findings or reports of examinations, which would support Dr. Lynd's assessment of Plaintiff's functional capacity, writing that:

> [U]nlike Dr. Fritzhand's assessment, Dr. Lynd's opinion is without the support of accompanying findings or examination. There is no evidence to substantiate deterioration to the degree indicated by Dr. Lynd.

[*Id.*]

Ultimately, the ALJ found the following:

1.   The claimant met the insured status requirements of the Social Security Act through September 30, 2006.

2.   The claimant has not engaged in substantial gain ful activity since July 1, 2001, the alleged onset date.

3.   The claimant has the following severe impairments:   lumbar disc disease, chronic low back pain and depression.

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work except for no climbing, crawling, no work at unprotected heights and hazardous equipment, no more than simple job instructions and no more than occasional interaction with others.

6.   The claimant is unable to perform any past relevant work.

7.   The claimant was born on August 23, 1972 and was 28 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.   The claimant has at least a high school education and is able to communicate in

English.

9.    Transferability of job skills is not
material to the determination of
disability because using the Medical-
Vocational Rules as a framework supports
a finding that the claimant is "not
disabled," whether or not the claimant
has transferable job skills.

10.   Considering the claimant's age,
education, work experience, and residual
functional capacity, there are jobs that
exist in significant numbers in the
national economy that claimant can
perform.

11.   The claimant has not been under a
disability, as defined in the Social
Security Act, from July 1, 2001 through
the date of this decision.

[AR at 24-25, 28, 30-31 (internal citations omitted).]

## II.  OVERVIEW OF THE PROCESS

The Administrative Law Judge ("ALJ"), in determining

disability, conducts a five-step analysis:

1.    An individual who is working and engaging in
substantial gainful activity is not disabled,
regardless of the claimant's medical condition.

2.    An individual who is working but does not have a
"severe" impairment which significantly limits his
physical or mental ability to do basic work
activities is not disabled.

3.    If an individual is not working and has a severe
impairment which "meets the duration requirement
and is listed in appendix 1 or is equal to a listed
impairment(s)", then he is disabled regardless of
other factors.

4.    If a decision cannot be reached based on current
work activity and medical facts alone, and the
claimant has a severe impairment, then the

17

> Secretary reviews the claimant's residual functional capacity and the physical and mental demands of the claimant's previous work. If the claimant is able to continue to do this previous work, then he is not disabled.
>
> 5. If the claimant cannot do any work he did in the past because of a severe impairment, then the Secretary considers his residual functional capacity, age, education, and past work experience to see if he can do other work. If he cannot, the claimant is disabled.

*Preslar v. Sec'y of Health and Human Servs*, 14 F.3d 1107, 1110 (6th Cir. 1994) (citing 20 CFR § 404.1520 (1982)). "The burden of proof is on the claimant throughout the first four steps of this process to prove that he is disabled." *Id.* "If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Secretary." *Id.*

## III. STANDARD OF REVIEW

In reviewing the ALJ's decision to deny disability benefits, the Court may not try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility. *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). Instead, judicial review of the ALJ's decision is limited to an inquiry into whether the ALJ's findings were supported by substantial evidence, 42 U.S.C. § 405(g), *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001), and whether the ALJ employed the proper legal standards in reaching his conclusion, *see Landsaw v. Sec'y of Health and Human Servs*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" is "more than a scintilla of evidence, but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip*, 25 F.3d at 286.

**IV.  ANALYSIS**

**A.  Rejection of Treating Physician's Evaluations**

Plaintiff argues that the ALJ erred in failing to afford controlling weight to the opinion of her treating physicians, Drs. Umar and Lynd, and in failing to give specific reasons for discrediting Drs. Umar and Lynd's opinions as to her capacity to function in the workplace.  For the reasons which follow, the Court disagrees.

In considering a disability claim, not all doctor's opinions are considered equally.  When considering medical evidence, the opinions of treating physicians are given controlling weight if the opinion is "well-supported by medically accepted clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm. of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (internal citations and quotations omitted).  This is because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)" who "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from

19

reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. When an ALJ does not give a treating physician's opinion controlling weight, he is required to "give good reasons" why the treating physician's opinion was discounted. *Id.*

Plaintiff argues that the ALJ should have given controlling weight to Dr. Umar's opinion that Plaintiff had a number of "marked" limitations in almost every facet of her life as a result of her depression. [AR at 460-63.] The ALJ looked carefully at that assessment but concluded that "Dr. Umar has been unduly restrictive (and/or inattentive) in assigning GAF scores" and rejected Dr. Umar's Mental Functional Capacity Statement because Dr. Umar did not provide "medical findings" on which the statement was based. [AR at 27.] Specifically, the ALJ was concerned with the fact that Dr. Umar assigned Plaintiff the same GAF of 50, which indicated serious mental health issues, on a regular basis without regard to changes (including what appear to be significant improvements at times) in her reported and observed well-being and mental health. This observation is supported by the evidence of record and provided a "good reason" why Dr. Umar's opinion was discounted.

As to the ALJ's rejection of Dr. Lynd's opinion that Plaintiff was plagued by serious physical limitations imposed by Plaintiff's

disc disease and lower back pain, the Court finds that the ALJ has again provided "good reasons" for doing so because he could find "no evidence to substantiate deterioration to the degree indicated by Dr. Lynd" in the absence of accompanying findings or an examination. Indeed, by all accounts in Dr. Lynd's notes prior to the decision of the ALJ, Plaintiff was responding well to the injection treatment with regard to pain management. There are no reported medical or other examination findings in his notes or those of any other physician which would provide the basis for his assessment of such a severe impairment. Rather, the reports of medical findings and physical examinations which are in the record concerning Plaintiff's disc disease and lower back pain, conducted by Dr. El-Kalliny (or at his behest) or consulting examining physician Dr. Fritzhand, reveal limitations which are reflected in the RFC determination of the ALJ, but those reports do not offer support for the dire portrait painted by Dr. Lynd.

Further, the determination of disability and a claimant's residual functional capacity are not medical opinions, and the resolution of the issues presented by these inquiries are reserved for the Commissioner. 20 C.F.R. § 404.1527(e). Statements about what a claimant can still do are relevant evidence, but they are not determinative, as the ALJ has the responsibility for assessing a claimant's residual functional capacity. 20 C.F.R. §§ 404.1513(b), 404.1527, 404.1545, 404.1546(c). In this instance,

21

the Court has carefully considered the ALJ's decision and finds that (1) the ALJ has "give[n] good reasons" why Drs. Umar and Lynd's opinions were discounted and (2) there is substantial evidence in the record to support the ALJ's reasoning and assessment of Plaintiff's residual functional capacity.  The Court concludes that the ALJ did not err as Plaintiff argues and will affirm the decision in this regard.

## 2.  Disability Based on Pain

Plaintiff next argues that the ALJ erred in determining that she was not disabled solely on the basis of her severe back pain. Pain alone, "if the result of a medical impairment, may be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984).  However, the ALJ need not take the claimant's assertions of pain or ailments at face value.  For example, the ALJ "may also consider household and social activities engaged in by the claimant" in evaluating a claimant's assertions as to limitations imposed by pain. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 532 (6th Cir. 1997).  Further, since tolerance of pain is a highly individualized inquiry, a determination of disability based on pain depends, necessarily, largely on the credibility of the claimant.  As such, the ALJ's credibility finding "'should not be discarded lightly.'"  *Houston v. Sec. of Health and Human Servs.*, 736 F.2d 365, 367 (6th cir. 1984) (quoting *Beavers v. Sec. of Health, Educ. and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)).

22

In this instance, there is evidence of record, noted by the ALJ, that Plaintiff reported caring for her children, feeding them, and keeping them in clean clothes. [AR at 85.] In November 2005, Plaintiff stated that she prepared food for herself and others, washed dishes every three days, and went shopping once or twice a week. [AR at 98.] Contrary to her testimony that she had no hobbies [AR at 504], Plaintiff reported in March 2007 that she watched television and read during the day. [AR at 111.] Considered in combination with the objective results of her medical exams and the opinions of the various physicians, these activities of daily living certainly provide substantial evidence to support the conclusion of the ALJ that Plaintiff was not disabled from all work by virtue of her reported pain alone. The Court shall affirm the decision in this regard, as well.

### 3. Substantial Evidence of Specific Occupations

Plaintiff next argues that the ALJ erred when he determined that there existed work in the national and regional economy as a tester/inspector that Plaintiff could do. Specifically, she complains that, upon cross-examination, the VE was unable to name any location in the region or national economy where a job as a pencil inspector, the VE's specific example of a tester/inspector position, could be found. Plaintiff has not, however, identified any legal authority which would indicate that the ALJ was required to identify specific companies or locations where those jobs could

23

be had.  Indeed, when deciding whether work exists in the national economy, the hiring practices of employers, whether a specific job vacancy exists, whether Plaintiff would actually be hired, or whether there is a lack of work in Plaintiff's local area are all irrelevant.  *See* 20 C.F.R. § 404.1566(a), (b), 416.966 (a), (b). The ALJ, citing the VE's uncontradicted testimony, appropriately provided examples of jobs that Plaintiff could do and indicated the number of jobs available in the region, pursuant to SSR 83-14, 1983 WL 31254 (SSA) *6 (1985), which is enough to pass muster with this Court.  The ALJ's decision is supported by substantial evidence in this regard and will be affirmed.[5]

---

[5]  Plaintiff has not provided any reason for the Court or the ALJ to doubt the reliability of the VE's testimony that the total available number of inspector/tester jobs available would be reduced by 10% if one took into account those jobs which would not provide for a sit/stand option, if that was necessary based on the ALJ's RFC finding.  Nor did the ALJ fail to resolve any conflict between the VE's testimony and the *Dictionary of Occupational Titles* with respect to whether a sit/stand option exists for the inspector/tester position.  SSR 00-4p requires the ALJ to ask the VE on the record about any conflicts with the DOT, obtain a reasonable explanation for any conflict, and explain the resolution of any conflict before relying on the VE's testimony.  *See* SSR 00-4p, 2008 WL 1898704 (SSA) (2000).  In this instance, when asked to identify any conflicts between his testimony and the DOT, the VE stated that he had previously testified that a sit/stand option was available in 90% of the inspector/tester jobs that he found Plaintiff could perform but that the DOT did not recognize a sit/stand option for the DOT based on his experience in employment service and as a VE.  [AR at 518.]  This was a reasonable explanation for the conflict with the DOT.  The point is ultimately moot, however, as the ALJ concluded that Plaintiff did not require a sit/stand option [AR at 28], rendering any dispute regarding a sit/stand option irrelevant.

### 4.   All Other Arguments Waived

Finally, Plaintiff has requested remand pursuant to sentence six of 42 U.S.C. § 405(g).  [Pl. Brief at 30.]  Plaintiff has failed to identify or discuss any additional evidence in her brief upon which such remand might be based, and her argument is, thus, waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

## V.   Conclusion

For all of the reasons stated above, the decision rendered by the ALJ and adopted by the Commissioner shall affirmed.

Accordingly, **IT IS ORDERED:**

(1)  That the Commissioner's motion for summary judgment [Record No. 10] shall be, and the same hereby is, **GRANTED.**

(2)  That Plaintiff's motion for summary judgment [Record No. 8] shall be, and the same hereby is, **DENIED.**

This the 10th day of June, 2009.



Signed By:

*Joseph M. Hood*

Senior U.S. District Judge